## Case No. 8,781.

### McELRATH v. McINTOSH et al.

[Brunner, Col. Cas. 559;[1] 11 Law Rep. 399; 1 Hayw. & H. 348.]

Circuit Court, District of Columbia. Nov. 21, 1848.

GOVERNMENT OFFICERS—POWER OF COURTS TO ENJOIN—MINISTERIAL ACT.

The courts of the United States have no authority to enjoin the officers of the government against performing any merely ministerial act, nor will a mandamus lie to the head of an executive department to compel the performance of an act not merely ministerial, but involving the exercise of judgment.

[Cited in Ex parte Reeside, Case No. 11,656.]

This was a bill for an injunction to prevent Betsey McIntosh from receiving, and the secretary of the treasury and the second comptroller from paying, to her more than one half of her claim of $7,680, awarded to her under the Cherokee treaties of 1817 and 1819. The parties were Hugh D. McElrath, complainant, and Betsey McIntosh, of the Cherokee Nation, residing in the Indian Territory west of the Mississippi, John H. Eaton, of Washington, D. C., and the secretary and second comptroller of the United States treasury department. The bill stated in substance that the respondent, Betsy McIntosh, a white woman, born within the United States, removed to and dwelt in the Cherokee Nation of Indians, where they were residing east of the river Mississippi, and became the head of an Indian family, and thereby became entitled under the treaties of 1817 and 1819, between the United States and the Cherokee Nation of Indians, to a reservation of six hundred and forty acres of land, including her buildings and improvements, by electing to remain in the United States and become a citizen thereof, and by filing her name accordingly in the office of the Cherokee agent of the United States in due form, as required by the eighth article of the said treaty of 1817. And afterwards, under the treaty of the 29th of December, 1835, concluded at New Echota, and the supplementary articles of 1st March, 1836, she removed with the Cherokees to their country west of the river Mississippi, on Arkansas and White rivers, and became entitled to compensation in money for her reservation of six hundred and forty acres of land and improvements, to be adjudicated by commissioners appointed by the United States, according to the seventeenth article of the said treaty of New Echota; whose award in favor of the claimants is, by the said treaty, declared final against the United States, and to be paid to the several and respective claimants, upon the certificate of the commissioners of the amount due to the several claimants. Notwithstand-

---

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

ing which, in January, 1845, she had received nothing for her reservation of six hundred and forty acres of land and improvements thereon, and she then employed the complainant, McElrath, to attend to and prosecute her claim, and engaged to pay him a commission of one half of whatever sum might be awarded to her, and accordingly executed a power of attorney to him on the 9th of January, 1845.

[Whereas by the treaties of 1817 and 1819, made and concluded between the United States and the Cherokee tribe of Indians, a reservation of 640 acres of land was reserved to Betsey McIntosh. Now, to the end that the said right may be prosecuted and ascertained before a proper tribunal, I do hereby authorize and empower H. D. McElrath my attorney in fact, for me and on my behalf, to cause said claim to be fairly prosecuted, whether before the Cherokee commissioners, congress, the judicial tribunals, or other department of government as to my attorney may appear fit and proper, and for him to do in the premises whatever and all things I, if present, could do and perform, intending and hereby giving full ratification to all his acts, without the future right of revocation being reserved or retained, revoking and making void all former powers of attorney by me made; and as compensation herewith attached and connected for the labor and services of my said attorney and expense of engaging suitable legal counsel (such as he may think fit) it is agreed and covenanted that he shall receive and be paid one-half of what may ultimately be recovered. The power, also, of substituting any other attorney in fact by him deemed necessary is fully authorized.

[In testimony whereof, I have hereto set my hand and seal, this 9th day of January, 1845.

her<br>
[Betsey X McIntosh.    (Seal.)<br>
mark

[Witness: G. W. Morgan, Wm. S. Holt.][2]

This power was duly acknowledged and certified. The bill further stated that the complainant, by virtue of the authority contained in that power to employ an attorney under him to prosecute the claim, employed the defendant, John H. Eaton, and agreed to give him for his services and agency in the matter one half of the compensation which the defendant, Betsey, had stipulated to give to the complainant, and to that end and effect executed and delivered to the defendant, Eaton, a writing and power. The bill further alleged that by the agency of the complainant and the defendant, Eaton, an award was made by the board of commissioners, on the —— day of May, 1847, in favor of the defendant, Betsey, for the sum of $7,680, and duly certified by the said commissioners, whereby the complainant and

said Eaton became entitled to one half of said sum. That when the certificate of the commissioners was first presented for payment, the second comptroller refused to pay, pretending that the appropriations which had been made by congress for carrying into effect the treaty of New Echota did not embrace Betsey McIntosh's case; and therefore the complainant's attorney, J. H. Eaton, applied to congress, who passed the resolution approved 14th March, 1848, in her favor. That upon presentation of the certificate of the commissioners in favor of the defendant, Betsey, her power of attorney and contract therein contained, and the power given by the complainant to Eaton, the second auditor of the treasury, issued a certificate in favor of the said. Eaton for $3,840, being one half the award in favor of the defendant, Betsey; but when that was presented to the second comptroller of the treasury he refused to approve and certify it, and yet continues to refuse, under the pretext that a general order made by the secretary of war in October, 1846, (Exhibit B.), inhibits any money being paid under this power of attorney, and so the complainant is obstructed from receiving as the attorney of the defendant, Betsey, either the whole sum due to her, or his part thereof, and the secretary of the treasury refuses to cause the said certificate to be paid, notwithstanding the appropriation for that purpose remains unexpended. That the power of attorney to the complainants was coupled with an interest, and cannot be revoked by the said Betsey, nor abrogated, nor impaired by the executive officers of the government, nor even by the congress of the United States. That Betsey McIntosh is a white woman, a native citizen of the United States, although residing in the Cherokee country, and therefore not within the order of the secretary of war, which contains the following clause: "Should any Indian or Indians, however, notwithstanding the above determination [to discountenance the practice of obtaining powers of attorney from Indians], persist in giving powers of attorney, no part of the sum which may be recovered thereupon will be paid to the persons holding them, except such an amount as, under the circumstances of the case, may appear to the department to be a fair and just compensation for their trouble and expense. The remainder will, in all cases, be remitted to the agent or sub-agent for payment to the Indian claimant in person."

The bill further stated that the secretary of war had thought fit to make his own valuation of the services of the defendant, Eaton, as the agent and attorney of the defendant, Betsey, and upon his valuation of those services had caused to be paid to the defendant, Eaton, as the attorney of the said Betsey, between one and two thousand dollars, which he received, not in full for his services, but only because the depart-

---

[2] [From 11 Law Rep. 399.]

ment would pay no more, and therefore he was unwillingly compelled to receive a part only. That application had been made to the defendant, Betsey, to renew or re-execute the power of attorney to the complainant, or to execute a power to the complainant to receive at the treasury of the United States his part of the sum contracted to be allowed to him, and now due to him and to the attorney, J. H. Eaton, which the defendant, Betsey, has declined to do. That the power of attorney, and the agreement and stipulations therein, were given by the defendant, Betsey, and received by the complainant with the intention that they should create, and under the belief that they did create, a specific lien, security, and assignment of one half of the demand of the said Betsey, and of one half of the money which should be allowed her by the United States for her reservation of land; and the complainant positively avers that without such security he would not have adventured his time, money, and services for the said Betsey, who resided with the Cherokee Indians in the far West, had but very little property except her said claim, and that property, so in her possession and visible, was not to be reached by any compulsory process from any court, state or federal, of the United States; that it was well understood by the defendant, Betsey, that the complainant would not undertake to prosecute her claim solely upon her personal responsibility for compensation, but required the lien and security by the specific authority to receive the money; that is, half of the money which should be allowed her for her reservation claim.

The bill prayed that Betsey McIntosh, John H. Eaton, Robert J. Walker, secretary of the treasury, and Albion K. Parris, the second comptroller, may be made parties, and that Betsey McIntosh might be enjoined from receiving out of the treasury of the United States any more than one half of the said certificate so allowed by the commissioner appointed under article 17 of the treaty of New Echota, until the matters of the bill shall be finally heard and decreed; and that the secretary of the treasury and second comptroller be enjoined from paying, or causing or allowing to be paid, unto the said Betsey McIntosh, the sum of $3,840, less by the sum which has been paid to the defendant, John H. Eaton, etc.

³ [Upon filing the bill, Geo. M. Bibb, for complainant, moved for an injunction as prayed in the bill, and contended:

[1st. That the power of attorney from Betsey McIntosh to McElrath, being coupled with an interest, is an assignment of one-half of her claim, and was a contract which the United States ought to recognize. That as to one-half of the claim, it was money received by the United States for the use of

³ [From 1 Hayw. & H. 348.]

the complainant. It was his money held by them in trust for him.

[2d. That it was a specific lien which followed the fund into the hands of the United States.

[3d. That the secretary of war had no authority to make the rule respecting the payment of money to the attorney of Indians, who have a right to appoint their own attorney. That the power was given before the order of October 1, 1846, and could not be controlled by it.

[4th. That Betsey McIntosh is a white woman, not an Indian, and that she is, therefore, not within the terms of the order.

[5th. That this court has jurisdiction to compel an executive officer of the government to perform any act which it is his duty to perform, if it be merely a ministerial act, not an executive act appertaining to the duties of his office as an executive officer; and that the act of paying this money to the complainant is a purely ministerial act which the official character of the defendant will not exempt him from the duty of performing.

[Ransom H. Gillett, solicitor of the treasury, for the defendants, the officers of the government.

[In the case before the court, the question is simply this: the executive branch of the government has decided that the faithful execution of the law requires that the money appropriated for this claim shall be paid directly to Betsey McIntosh and not to the claimant under the power of attorney; and this court is asked to grant an order prohibiting such payment. The power and jurisdiction of the court over the matter are denied in toto.

[1. This court has no jurisdiction beyond what has been conferred upon it by statute. These statutes are the 13th and 14th sections of the judiciary act (1 Stat. 80–82), the 11th section of judiciary act of Feb. 13, 1801 (2 Stat. 98), so far as that section is not repealed; the 1st, 3d and 5th sections of the act of February 27, 1801 (2 Stat. 103, 105, 106), establishing this court. See 1 Kent. Comm. (6th Ed.) 339, and cases there cited; U. S. v. Coolidge [Case No. 14,857]; U. S. v. Worrall [Id. 16,766].

[2. The writs expressly authorized by the judiciary acts are such, and only such, as are necessary to carry out the jurisdiction conferred upon the court by those statutes agreeable to the principles and usages of law. McIntire v. Wood, 7 Cranch [11 U. S.] 504; Smith v. Jackson [Case No. 13,064]; McClung v. Silliman, 6 Wheat. [19 U. S.] 598; 1 Kent, Comm. 322; Bouv. Law Dict. tit. "Mandamus," and cases there cited.

[3. The writs specified in the judiciary act can only apply to cases in which the court has jurisdiction over the party or the subject matter of the suit, so that the court can punish the party for disobedience, or change

the title to the subject matter of the suit by judicial proceedings. This court has no jurisdiction over Betsey McIntosh in the Indian country, nor over the United States as a corporation, nor the money in the treasury, and therefore has no authority to act upon or control either. McKim v. Odom, 3 Bland, 423, 424; Waller v. Harris, 7 Paige, 167; Iveson v. Harris, 7 Ves. 251; Fellows v. Fellows, 4 Johns. Ch. 25; 3 Daniell, Ch. Prac. 133, 134; Sugd. Vend. 156; Osborn v. Bank, 5 Pet. Cond. R. 764, 768; Story, Confl. Law, 450; Act Feb. 27, 1801, § 5 (2 Stat. 106); Act May 3, 1802, § 1 (2 Stat. 193). See, also, Act Feb. 28, 1839, § 1 (5 Stat. 321), where provision is made concerning absent defendants.

[4. There is no authority in law for a plaintiff to make the United States a party defendant in a suit, or to attach or control their moneys in the treasury, either directly or indirectly. Naming an officer of the treasury in the process, and serving it upon him, will not affect the United States nor their money in the treasury. McKim v. Odom, 3 Bland, 420–424; Op. Atty. Gen. pp. 507–510, 1066, 1103, 1303, 1304, 1425.

[5. The common law of Maryland, even if now in force in this district under the act for organizing the District of Columbia (2 Stat. 104), does not extend the jurisdiction of this court over the executive officers of the government as such; for the laws of Maryland in force at the time of the passage of that act did not authorize their courts to issue writs of injunctions or mandamus against an executive officer of that state, or an officer of the general government. No case of that kind has been cited, and none can be found. By the act of July 15th, 1790, the seat of the national government was transferred to this district on the first Monday in December, 1800. By the 1st section of the act the operation of "the laws of the state within said district shall not be affected by this acceptance until the time fixed for the removal thereof, and until congress shall otherwise provide." The laws of Maryland at the time of the acts of July 16, 1790, and February 27, 1801, contained no provision or authority giving any court in that state jurisdiction over the officers of the executive departments of the federal government. If the courts of that state could not then have exercised such jurisdiction, then no court can now do it, the powers of the courts not having increased. If the supreme or other high court of Maryland had the power claimed, it does not follow that such power is delegated to this court, because it is not provided .that this court is clothed with the same power. We may as well say that the first section of District of Columbia act transferred her highest courts here, as to affirm that the jurisdiction was transferred to this court when neither is provided.

[6. Even if the courts have jurisdiction over the officer in any case, such jurisdiction only extends to cases of a ministerial, and not to those of an executive character. The acts which the complainant wishes performed are of an executive character, and therefore this court has no jurisdiction. Kendall v. U. S., 12 Pet. [37 U. S.] 524; McIntyre v. Wood, 7 Cranch [11 U. S.] 504; McClung v. Silliman, 6 Wheat. [19 U. S.] 598; Decatur v. Paulding, 14 Pet. [39 U. S.] 497; 1 Bland, 186–189, 584, in note; Bordley v. Lloyd, 1 Har. & McH. 27; Ellicott v. Levy Court, 1 Har. & J. 359; Runkel v. Winemiller, 4 Har. & McH. 429; Howard v. Levy Court, 1 Har. & J. 558; Williamson v. Carman, 1 Gill & J. 184; McKim v. Odom, 3 Bland, 407; Dig. Md. 1847, tit. "Mandamus," 706, 707; Brashears v. Mason, 6 How. [47 U. S.] 92, 100–102. Ministerial acts are those which are specifically directed by a superior power to be performed by an inferior, in relation to which such subordinate ministerial officer is required to exercise no discretion or judgment. He must literally obey the command and perform the act directed. Executive acts are those which involve discretion or judgment in determining whether the duty exists and whether the law and the usual and appropriate forms have been complied with, and these are acts which are performed by public officers in executing the laws in the ordinary routine of the business of the government. Decatur v. Paulding, 14 Pet. [39 U. S.] 497; Kendall v. U. S., 12 Pet. [37 U. S.] 524. By the act of July 9, 1832 (4 Stat. 564) § 1, and that of June 30, 1834 (4 Stat. 735), the president is authorized to make rules and regulations for carrying into effect all laws relating to the Indian affairs, including accounts. This power he executed through the war department. Williams v. Howard, 1 How. [42 U. S.] 290; Parker v. U. S., 1 Pet. [26 U. S.] 296; U. S. v. Eliason, 16 Pet. [41 U. S.] 291; Wilcox v. Jackson, 13 Pet. [38 U. S.] 490; Holc. U. S. Dig. 220–222. The act of August 7, 1789 (1 Stat. 49), ordains that the secretary of war shall conduct the business of the department in such manner as the president shall from time to time order and instruct. On the 11th of November, 1836, the secretary of war adopted a regulation by which the commissioner of Indian affairs was directed to rigidly examine all claims and accounts, and when in the exercise of a sound discretion he should be of the opinion that the claim was just, that it should receive his sanction and to be passed to the second auditor for settlement; and when contrary to the regulations or instructions, or in his opinion improper or unjust, that he should withhold his sanction and state his objection for the consideration of the accounting officers; but, in all cases of difficulty depending on discretion or authority, that he should take the direction of the secretary of war. Report of Commissioner of Indian Affairs to congress of December 1, 1837.][3]

---

[3] [From 1 Hayw. & H. 348.]

4 [Before the money can be obtained from the treasury upon this claim, the following steps must be taken: (1). It must undergo an administrative examination by the commissioner of Indian affairs, under Gen. Jackson's regulations of November 11th, 1836. (2). It must then be examined and settled by the second auditor, under the act of March 4, 1817 (3 Stat. 366), and that of February 24, 1819 (3 Stat. 487, §§ 1, 2). (3). It is then to be re-examined by the second comptroller; and if there is a power of attorney involved in the case, he finally passes upon its validity and effect, and certifies the settlement to the secretary of war, under the act of March 3, 1817 (3 Stat. 367, 368, §§ 9, 15). He decides whether, in his opinion, there is an appropriation out of which the sum due can be paid. The sum allowed is credited on the second auditor's books. (4). The secretary of war on this founds his requisition on the secretary of the treasury. He judges whether it is a proper case to pay, and whether there is an appropriation out of which it may be paid. (5). This requisition is countersigned by the second comptroller, and charged to the appropriation account kept in his office. Act March 3, 1809 (2 Stat. 535). (6). It is then sent to the second auditor, (who acts as his register,) where it is recorded or charged against the person to balance his account. Id. (7). The requisition then goes to the secretary of the treasury, who issues his warrant on it; and the amount is charged on his book of appropriations. He sees that there is an appropriation out of which it can lawfully be paid, and judges whether he can spare the money from the treasury, and whether there are or not other demands upon it, to which good policy and justice require him to give a preference. Act March 3, 1809, § 1 (2 Stat. 535); Act May 7, 1822 (3 Stat. 689); Act Sept. 2, 1789 (1 Stat. 65). (8). It is then taken to the first comptroller, who decides whether there is an appropriation out of which it can be paid, and if so, he charges it to such appropriation, and then countersigns it. Act establishing department of treasury, Sept. 11, 1789 (1 Stat. 66); Act March 3, 1809 (2 Stat. 535). (9) It then goes to the register, who makes the same examination, and if he finds there is such appropriation, he charges that appropriation with it, and countersigns the warrant; and then it is sent to the treasurer. Treasury Act, Sept. 2, 1789, § 6 (1 Stat. 67); Act March 3, 1809, § 1 (2 Stat. 535). (10). If the warrant is in due form, and has the proper signatures showing that all the regulations and forms have been complied with, the treasurer then draws a draft on himself, or an assistant treasurer, and the party receipts it on the face of the warrant. The draft, on being indorsed by the payer, is paid in money. The treasurer never pays to any one but the person named in the warrant. He never judges of power of attorney, but the exercise of his discretion or judgment is confined to the examination of the warrant issued by the secretary of the treasury and the ascertaining whether it conforms to the act of March 3, 1809.]4

5[All of the acts of the respective officers through whose hands a claim of this nature has to pass are clearly of an executive nature. None of them can be performed and none declined, without the exercise of the distinguishing characteristic of an executive act, judgment or discretion. Executive officers, appointed by the president, can be controlled in the exercise of their duties only by the president. McClung v. Silliman, 6 Wheat. [19 U. S.] 598; Holc. Dig. p. 571, § 43. The president is beyond the power of any other department except in cases of impeachment. Kendall's Case, 12 Pet. [37 U. S.] 524; Holc. Dig. p. 221. This necessarily results from the power conferred by article 2, § 3, of the constitution, requiring him to take care that the laws be faithfully executed. And if the president can be controlled in the execution of his duties, directly by the judiciary, it is equally clear that he cannot be reached by proceeding against his subordinates. Were the opposite doctrine to prevail, there would no longer be, what was intended by the framers of the constitution, an independent and distinct executive branch of the government; for all acts required of the president in causing the laws to be faithfully executed, are, of necessity, performed through and by his subordinates. The power contended for would enable this court to control the whole machinery of the government. A pension agent could be compelled to pay on a power of attorney to the exclusion of the pensioner in person, even whether such power was made in conformity to the regulations under which the agent was acting or not. The court could direct to whom the money should be paid under our treaty with Mexico. In time of war it might enjoin against supplying the pay, commissary or quartermaster's department, and direct the payment of a debt to the agent of our adversary, to the extent of the entire means in the treasury. This court might even enjoin the salaries of the justices of the supreme court of the United States, or declare that of the president vested in and payable to one of his creditors. It would require officers to perform acts for which it would be the duty of the president to displace them.

[If it is said that there ought to be some control over the executive in the discharge of the various duties committed to that branch of the government, two answers may be given: (1.) The constitution and laws have created no such tribunal. (2.) Judges appointed for life, and not elected by the

---

people, but beyond their reach, are no better qualified for this duty than the executive, who, once in four years submits his acts to the consideration of his constituents.][5]

Before CRANCH, Chief Judge, and MOR-SELL and DUNLOP, Circuit Judges.

CRANCH, Chief Judge. The first question in natural order is that of jurisdiction. It is, therefore, the first which the court will consider. It is understood, as admitted in argument, that if the act intended to be enjoined be not a merely ministerial act, the court has not jurisdiction to enjoin the officers of the treasury against performing it. This doctrine was first promulgated by the supreme court of the United States in the case of Marbury v. Madison, 1 Cranch [5 U. S.] 165, where Marshall, C. J., says: "If some acts be examinable and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction." And in page 166 he says: "Where the heads of departments are the political or confidential agents of the executive merely to execute the will of the president, or rather to act in cases in which the executive possesses no constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable." And again, in page 170, he says: "The province of the court is solely to decide on the rights of individuals not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are by the constitution and laws submitted to the executive, can never be made in this court." The chief justice then proceeds to show that the act required to be done (the delivery of the commission to Mr. Marbury) was purely a ministerial act, in respect to which the executive had no discretion.

In the case of Kendall v. U. S., 12 Pet. [37 U. S.] 609, Mr. Justice Thompson, in delivering the opinion of the supreme court of the United States, says: "Under the first head of inquiry it has been considered by the counsel on the part of the postmaster-general that this is a proceeding against him to enforce the performance of an official duty, and the proceeding has been treated as an infringement upon the executive department of the government, which has led to a very extensive range of argument upon the independence and duties of that department; but which, according to the view taken by the court of the case, is entirely misapplied. We do not think that the proceedings in this case interfere in any respect whatever with the rights or duties of the executive, or that it involves any conflict of powers between the executive and judicial departments of the government. The mandamus does not seek to direct or control the postmaster-general in

the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which neither he nor the president had any authority to deny or control." Again he says: "The executive power is vested in a president; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power. But it by no means follows that every officer in every branch of that department is under the exclusive direction of the president. Such a principle, we apprehend, is not and certainly cannot be claimed by the president. There are certain political duties imposed upon many officers of the executive department, the discharge of which is under the direction of the president. But it would be an alarming doctrine that congress cannot impose upon any executive officer any duty they may think proper, which is not repugnant to any rights secured and protected by the constitution; and in such cases the duty and the responsibility grow out of, and are subject to, the control of the law, and not to the direction of the president. And this is emphatically the case where the duty enjoined is of a mere ministerial character. Let us proceed, then," he says, "to an examination of the act required by the mandamus to be performed by the postmaster-general; and his obligation to perform, or his right to resist the performance, must depend upon the act of congress of the 2d of July, 1836. This is a special act for the relief of the relators, Stockton and Stokes, and was passed, as appears on its face, to adjust and settle certain claims which they had for extra services, as contractors for carrying the mail. These claims were, of course, upon the United States, through the postmaster-general. The real parties to the dispute were, therefore, the relators and the United States. The United States could not, of course, be sued, or the claims in any way enforced against the United States, without their consent, obtained through an act of congress, by which they consented to submit these claims to the solicitor of the treasury to inquire into the equity of the claims, and to make such allowance therefor as, upon a full examination of all the evidence, should seem right according to the principles of equity; and the act directs the postmaster-general to credit the relators with whatever sum, if any, the solicitor shall decide to be due to them, for or on account of any such services or contract." Again (page 611), the court say: "Under this law the postmaster-general is vested with no discretion or control over the decisions of the solicitor; nor is any appeal or review of that decision provided for by the act. The terms of the submission was a matter entirely in the discretion of congress, and if they thought proper to vest such a power in any one, and especially as the ar-

---

[5] [From 1 Hayw. & H. 348.]

bitrator was an officer of the government, it did not rest with the postmaster-general to control congress or the solicitor in that affair." Again (page 613), the court say: "The act required by the law to be done by the postmaster-general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial, and about which the postmaster-general had no discretion whatever. The law, upon its face, shows the existence of accounts between the relators and the postoffice department. No money was required to be paid, and none could have been drawn out of the treasury without further legislative provision, if this credit should overbalance the debit standing against the relators. But this was a matter with which the postmaster-general had no concern. He was not called upon to furnish the means of paying such balance, if any should be found. He was simply required to give the credit. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept; and was an official act in the same sense that an entry in the minutes of a court, pursuant to an order of the court, is an official act. There is no room for the exercise of any discretion, official or otherwise: all that is shut out by the direct and positive command of the law, and the act required to be done is, in any just sense, a mere ministerial act."

But the case now before the circuit court of the District of Columbia is very different from that of Stockton & Stokes. This is an application upon a bill in equity filed for an injunction to inhibit the secretary of the treasury and the second comptroller from paying to Betsy McIntosh the sum of $3,840, less by the sum which has been paid to the defendant, John H. Eaton, so that, including the sum so already paid to him, the one half of the said certificate in favor of Betsey McIntosh may be held subject to the final decree of this court. This application is founded upon the supposition that this court may, by its final decree, order the secretary of the treasury to pay to the complainant, McElrath, half the amount of the said certificate, including what has been paid to the defendant, Eaton; for if this court cannot make such a final decree, the injunction, if granted, will be vain and nugatory. This, then, is a question of jurisdiction, and depends upon the question whether the payment of this claim by the secretary of the treasury is an official, executive act, or is purely a ministerial act, as in the case of Stockton & Stokes.

The difference between ministerial acts and executive official acts is clearly stated by the supreme court in the case of Decatur v. Paulding, 14 Pet. [39 U. S.] 514, 515. Mr. Chief Justice Taney, in delivering the opinion of the court, says: "In the case of Kendall v. U. S., 12 Pet. [37 U. S.] 524. it was decided in this court that the circuit court for Washing-

ton county, in the District of Columbia, has the power to issue a mandamus to an officer of the federal government commanding him to do a ministerial act. The first question, therefore, to be considered in this case is whether the duty imposed upon the secretary of the navy by the resolution in favor of Mrs. Decatur was a mere ministerial act. The duty required by the resolution was to be performed by him as the head of one of the executive departments of the government in the ordinary discharge of his official duties. In general, such duties, whether imposed by act of congress or by resolution, are not mere ministerial duties. The head of an executive department of the government in the administration of the various and important concerns of his office is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of congress, under which he is from time to time required to act. The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties." Again (page 516), he said: "The interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them. The doctrines which this court now hold in relation to the executive departments of the government are the same that were distinctly announced in the case of Kendall v. U. S., 12 Pet. [37 U. S.] 524." Again (page 516), he said: "We have referred to these passages in the opinion of the court in the case of Kendall v. U. S., in order to show more clearly the distinction taken between a mere ministerial act, required to be done by the head of an executive department, and a duty imposed upon him in his official character as the head of an executive department, in which judgment and discretion are to be exercised. There was in that case a difference of opinion in the court in relation to the power of the circuit court to issue a mandamus. But there was no difference of opinion respecting the act to be done. The court was unanimously of opinion that in its character the act was merely ministerial. In the case before us it is clearly otherwise; and the resolution in favor of Mrs. Decatur imposed a duty on the secretary of the navy, which required the exercise of judgment and discretion; and in such a case the circuit court had no right by mandamus to control his judgments, and guide him in the exercise of a discretion which the law had confided to him."

The same doctrines are affirmed by the supreme court in the case of Brashear v. Mason, 6 How. [47 U. S.] 100, where Mr. Justice Nel-

son, in delivering the opinion of the court, says: "We are also of opinion that if the plaintiff has made out a title to his pay as an officer of the United States navy, a mandamus would not lie in the court below to enforce the payment. The constitution provides that no money shall be drawn from the treasury but in consequence of appropriations made by law. Article 1, § 9. And it is declared by act of congress (3 Stat. 689, § 3), that all moneys appropriated for the use of the war and navy departments shall be drawn from the treasury by warrants of the secretary of the treasury, upon requisitions of the secretaries of these departments, countersigned by the second comptroller." And (in page 101) he says: "In the case of Decatur v. Paulding, 14 Pet. [39 U. S.] 497, it was held by this court that a mandamus would not lie from the circuit court of this district to the secretary of the navy to compel him to pay to the plaintiff a sum of money claimed to be due her as a pension under a resolution of congress. There was no question as to the amount due, if the plaintiff was properly entitled to the pension; and it was made to appear in that case, affirmatively, on the application, that the pension fund was ample to satisfy the claim. The fund, also, was under the control of the secretary, and the money payable on his own warrant. Still, the court refused to inquire into the merits of the claim of Mrs. Decatur to the pension, or to determine whether it was rightfully withheld or not by the secretary, on the ground that the court below had no jurisdiction over the case, and therefore the question was not properly before this court on the writ of error. The court say that the duty required of the secretary by the resolution was to be performed by him as the head of one of the executive departments of the government in the ordinary discharge of his official duties; that, in general, such duties, whether imposed by act of congress or by resolution, are not mere ministerial duties; that the head of the executive department of the government, in the adminstration of the various and important concerns of his office, is continually required to exercise judgment and discretion; and that the court could not by mandamus act directly upon the officer, and guide and control his judgment or discretion in matters committed to his care in the ordinary discharge of his official duties. The court distinguish the case from Kendall v. U. S., 12 Pet. [37 U. S.] 524, where there was a mandamus to enforce the performance of a mere ministerial act, not involving on the part of the officer the exercise of any judgment or discretion. The principle of the case of Mrs. Decatur is decisive of the present one. The facts here are much stronger to illustrate the inconvenience and unfitness of the remedy. Besides, the duty of inquiring into and ascertaining the rate of compensation that may be due to the officers, under the laws of congress, no payment can be made unless there

has been an appropriation for the purpose; and if made, it may have become already exhausted, or prior requisitions may have been issued sufficient to exhaust it. The secretary is obliged to inquire into the condition of the fund, and the claims already charged upon it, in order to ascertain if there is money enough to pay all the accruing demands; and if not enough, how it shall be apportioned among the persons entitled to it. These are important duties, calling for the exercise of judgment and discretion on the part of the officer, and in which the general creditors of the government (to the payment of whose demands the particular fund is applicable) are interested, as well as the government itself. At most, the secretary is but a trustee of the fund for the benefit of all those who have claims chargeable upon it, and like other trustees is bound to administer it with a view to the rights and interests of all concerned. It will not do to say that the result of the proceeding by the mandamus will show the title of the relator to his pay, the amount, and whether there were any moneys in the treasury applicable to the demand; for upon this ground any creditor of the government would be enabled to enforce his claim against it through the head of the proper department by means of this writ; and the proceeding by mandamus would become as common in the enforcement of demands upon the government as the action of assumpsit is to enforce like demands against individuals."

In the case before this court the secretary of the treasury, in executing the resolution of congress of the 14th March, 1848, was called on by the complainant to pay to him, as assignee of Betsey McIntosh, one half the sum appropriated by that resolution, less the sum already paid to the defendant, J. H. Eaton. The validity and construction of the power of attorney and assignment set up by McElrath, and the applicability and construction of the act of congress of the 29th July, 1846 (chapter 66) entitled "An act in relation to the payment of claims," are necessarily involved in the duty required by the secretary of the treasury to execute the resolution aforesaid of March, 1848. It may be observed, also, that the resolution of the 14th of March, 1848, requires the secretary to pay the money to Betsey McIntosh (herself), not to her executors, administrators, or assigns. That the supposed assignment to McElrath, if it be an assignment, purports to be of only a part of the debt due by the United States, and that the power of attorney to McElrath does not expressly authorize him to receive the money, or any part of it, but purports to be only a power to prosecute the claim to allowance, or judgment; so that, upon these points also, it would be necessary that the secretary, before ordering the payment of the money, should decide whether he could lawfully pay the money to any other person than Betsey McIntosh herself, whether it would not be contrary to the policy of the

law, especially in the case of an Indian claim, to pay a part only of the claim, and he must also decide whether the power of attorney was duly executed. These are all acts of executive discretion, in which the secretary has sought the advice and opinion of the attorney-general of the United States, and can in no just sense be said to be mere ministerial acts. In the exercise of this discretion, this court has no right to guide or control the executive officer, or to entertain any appeal from his decision.

Upon these authorities and by these reasons, this court is satisfied that the payment of the claim of Betsey McIntosh is not a mere ministerial act, but is a duty appertaining to the office of secretary of the treasury, in the discharge of which he has a discretion which this court has not jurisdiction to control; and being of that opinion the court deems it unnecessary, as it would be unavailing, to give any opinion upon the other questions which have been raised in argument.

The court, therefore, refuses to grant the injunction prayed for against the secretary, and second comptroller of the treasury.